UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

Corporate Real Estate Services, Inc.,

      Plaintiff,

v.

Wells Fargo Bank, N.A.

      Defendant.

MEMORANDUM OPINION
AND ORDER
Civil No. 12-1209 ADM/JJK

_____

William M. Burns, Esq., R. Thomas Torgerson, Esq., and David L. Tilden, Esq., Hanft Fride, PA, Duluth, MN, on behalf of Plaintiff.

Richard T. Thomson, Esq., and Amy L. Schwartz, Esq., Lapp, Libra, Thomson, Stoebner & Pusch, Chartered, Minneapolis, MN, on behalf of Defendant.

_____

## I.  INTRODUCTION

On December 13, 2013, the undersigned United States District Judge heard oral argument on Defendant Wells Fargo Bank, N.A.'s ("Wells Fargo") Motion for Summary Judgment [Docket No. 18]. Plaintiff Corporate Real Estate Services, Inc., ("CRS") opposes the motion. The parties' dispute centers on the interpretation of a contract regarding services provided by CRS to Wells Fargo. For the reasons stated herein, Wells Fargo's motion for summary judgment is denied.

## II.  BACKGROUND

As part of commercial lease agreements, tenants sometimes pay maintenance fees, real estate taxes, utilities, and other fees in addition to rental payments. Plaintiff CRS provides auditing, consulting, and administration services to commercial tenants. Among other things, CRS reviews its client's commercial lease or leases for errors and other discrepancies to ensure

the client is not inadvertently overpaying on its obligations.

On February 1, 2007, Wells Fargo contracted CRS for commercial lease auditing services for certain Wells Fargo commercial facilities. R. Thomas Torgerson Aff. [Docket No. 36] Ex. D (the "Agreement") at 1. The contract between the parties stated CRS would review designated commercial leases for miscalculations, errors, and other possible cost savings (termed "Discrepancies"). Id. at § 1.1. In exchange, Wells Fargo agreed to compensate CRS as follows:

> 2.1. Contingency Fee.
>
> [¶1] In consideration for the Work, Client shall pay to CRS for any audit issues found by CRS that result in Discrepancies, a fee (the "Contingency Fee") equal to thirty four percent (34%) of the aggregate amount which is (i) reimbursed to Client by the landlord; (ii) applied by Client to future rents or any other obligation owed by Client to the landlord; and/or (iii) rebated to Client in any other fashion acceptable to Client (collectively, "Savings"). The Contingency Fee shall be payable for all Savings relating to the time period from commencement of the lease term to the end of the calendar year of formal resolution with the landlord ("Savings").
>
> [¶2] To the extent that Discrepancies corrected due to the audit Work result in limited recoveries (i.e. Landlord does not allow for prior year recoveries and the savings are primarily in the future) Client and CRS will endeavor to arrive at an equitable Fee arrangement.
>
> [¶3] By way of example: Audit Work completed in 2007 results in the discovery of Discrepancies in a 2004 base year but the lease only allows for a one year look back, therefore only 2006 and forward are subject to adjustments. CRS could then be entitled to Fees from Savings for 2008 in addition to 2006 and 2007 in accordance with the above Fee structure. The parties also recognize that when there is no prohibition, pursuant to the lease, in obtaining retroactive adjustments, yet a settlement is reached with the landlord limiting such adjustment, Client and CRS will endeavor to arrive at an equitable Fee arrangement.
>
> [¶4] A Contingency Fee shall be due and payable to CRS at such time that Savings are received or applied for the benefit of Client. It is understood that Savings include any and all amounts, payments or

>   other forms of remuneration, which benefit Client by any form or
>   method in connection with, directly, or indirectly in any lease year,
>   the Discrepancies found by CRS.  Client shall promptly forward
>   copies of all relevant information and documentation to CRS relating
>   to the computation of Savings.

Agreement § 2.1 (paragraphs numbered for ease of reference).  The Agreement applies Minnesota law to the interpretation of its provisions.  Id. § 4.6.

In 2009, pursuant to the Agreement, CRS conducted lease audits for three Wells Fargo locations in Colorado.  Torgerson Aff. Ex. C ("Carr Dep.") at 67.  As part of the audits, CRS found that Wells Fargo's Colorado landlord for these locations had overcharged Wells Fargo for HVAC services, and had also incorrectly calculated operating expenses charged to Wells Fargo.  Id. at 73-79.  Wells Fargo and CRS negotiated with Wells Fargo's Colorado landlord, and ultimately received rent credits and a waiver of expenses totaling $112,804.98.  Carr Dep. Ex. 7.  Wells Fargo paid CRS $38,353.71 for its services.  Id.; Torgerson Aff. Ex. B ("Cenci Dep.") at 66-67.

At approximately the same time in 2009, Wells Fargo asked CRS to audit its lease with Financial District Properties WF, LLC ("FDP"), for a large facility in Davenport, Iowa.  Cenci Dep. 24-25.  On April 16, 2009, CRS Vice President Robert Cenci sent FDP a letter in which CRS notified FDP of several auditing issues in connection with lease years 2003 through 2008.  Cenci Dep. Ex. 3.  CRS wrote that FDP had failed to credit Wells Fargo for an estimated $446,256.00 paid by Wells Fargo to FDP in 2006.  It also concluded FDP had over-billed Wells Fargo in several respects.  Id.  Specifically, CRS found FDP had miscalculated Wells Fargo's "expense stop"—a form of discount based on square footage—for several years, resulting in overcharges.  In addition, CRS concluded FDP had overcharged Wells Fargo for management

and maintenance fees.  The over-billings found by CRS totaled $1,403,911.61.  Id.  According to FDP's records, this amount was owed but not paid by Wells Fargo.

CRS attempted to negotiate with FDP to reach a resolution regarding the discrepancies, but no agreement was reached.  Richard Thomson Aff. [Docket No. 23] Ex. 1 ("CRS Dep."), at Dep. Ex. 8.  On or about June 18, 2009, FDP filed suit against Wells Fargo.  FDP alleged Wells Fargo had failed to pay for certain leased space, and that Wells Fargo had not paid outstanding expenses totaling over $1 million.  See CRS Dep. Ex. 10.  Wells Fargo counterclaimed, alleging FDP had overcharged Wells Fargo by miscalculating its expense stop and failing to credit the 2006 payments.  Erik Miller Aff. [Docket No. 21] ¶ 2.  CRS assisted Wells Fargo's counsel during the lawsuit.

During the course of the lawsuit, CRS sent Wells Fargo an invoice for $151,727.00, which reflected 34% of the $446,256.00 in uncredited payments CRS had previously identified.  Wells Fargo paid the invoice on April 29, 2010.  Id. ¶ 3; CRS Dep. Ex. 14.

On December 13, 2011, Wells Fargo and FDP reached a settlement.  CRS Dep. Ex. 16.  The settlement agreement included three key terms: (1) a waiver of all claims and damages which did or could have accrued between April 6, 1994, and April 30, 2009; (2) payment by FDP to Wells Fargo of $146,000, in the form of rent credits; and (3) an agreement that from January 1, 2011, until the end of the lease term, Wells Fargo's expense stop would be $290,000.  Id. at ¶¶ 3-5.

On January 12, 2012, Wells Fargo sent CRS a letter in which it stated that, pursuant to the Agreement, it was enclosing $49,640, which was 34% of the $146,000 paid to Wells Fargo in the settlement.  Wells Fargo concluded that this amount reflected the total amount owed to CRS.

CRS Dep. Ex. 19. On January 26, 2012, CRS sent Wells Fargo an invoice for $421,927.42. This amount reflected 34% of $1,094,963—the over-billed amount FDP waived in the settlement agreement—in addition to 34% of the $146,000 FDP paid to Wells Fargo in the settlement. Id. Ex. 17. Wells Fargo did not pay this invoice.

On May 18, 2012, CRS filed this action against Wells Fargo for breach of contract. CRS claims that under the Agreement, it is entitled to 34% of: (1) the $1,094,963 in over-billings waived in the settlement agreement; (2) the $146,000 paid in settlement; and (3) the recalculated expense stop of $290,000 for the year 2011. CRS also claims it is entitled to retain the $151,727 paid to it by Wells Fargo, which is 34% of the $446,256 Wells Fargo paid to FDP in 2006, but for which Wells Fargo had not previously received credit.[1] See Compl.

On November 30, 2012, Wells Fargo filed an amended answer and counterclaim [Docket No. 13]. Wells Fargo alleges it is entitled to a return of the $151,727 it previously paid to CRS in connection with the Iowa audit. Wells Fargo claims it paid this invoice based on CRS' false representation that this was the amount owed. Wells Fargo also seeks a return of about $38,353.71, the fee it paid CRS for its work auditing the Colorado leases discussed above.

## III. DISCUSSION

### A. Standard of Review

Rule 56(c) of the Federal Rules of Civil Procedure states a court shall grant summary judgment if no genuine issue as to any material fact exists and the moving party is entitled to judgment as a matter of law. "While a party moving for summary judgment has the burden of

---

[1] The parties' allegations and arguments regarding the amount at issue have some discrepancies. In its Complaint, CRS alleges it is owed $677,257.96. This amount is $5,003.50 more than 34% of the amounts listed above. For its part, Wells Fargo calculates CRS's claim as 34% of $1,094,000 plus $446,255.88, totaling $523,686.70.

5

y

showing that there is no genuine issue of fact for trial, a nonmoving party seeking to avoid having summary judgment entered against it may not rest on mere allegations or denials, but must set forth specific facts sufficient to raise a genuine material issue for trial." Thomas v. Runyon, 108 F.3d 957, 959 (8th Cir. 1997).

A fact dispute is "material," and will thus preclude summary judgment, only if the dispute "might affect the outcome of the suit under the governing law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). And where the moving party has carried its burden, the nonmoving party must show that the dispute is "genuine": it must show that there is more than "some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). The "very mission of the summary judgment procedure is to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." Fed. R. Civ. P. 56(e) advisory committee's note to 1963 Amendment.

## B. "Savings" Under the Agreement

To a large extent, determination of the parties' claims depends on § 2.1 of the Agreement, which establishes CRS's contingency fee. Paragraph 1 of § 2.1 defines "Savings," from which the contingency fee is calculated, as "the aggregate amount which is (i) reimbursed to Client by the landlord; (ii) applied by Client to future rents or any other obligation owed by Client to the landlord; and/or (iii) rebated to Client in any other fashion acceptable to Client."

Wells Fargo argues the term "Savings" unambiguously describes only money or value actually paid to Wells Fargo; it does not encompass the over $1 million in over-billings waived by FDP, or the $446,256 payment that FDP later acknowledged. Under Wells Fargo's interpretation, Subsection (i) addresses reimbursement, and thus includes only actual money paid

back to Wells Fargo. Subsection (ii) addresses application of credits to future rent or other payments, and Wells Fargo argues FDP's "waiver of bogus charges for past years" is not an amount Wells Fargo can apply to future obligations. And, Subsection (iii) addresses "rebated" amounts, which Wells Fargo defines as "return of part of a payment." See Def.'s Mem. Supp. Summ. J. [Docket No. 20] ("Def.'s Supp.") at 18 (citing Merriam-Webster Dictionary and Black's Law Dictionary (9th ed. 2009)). In Wells Fargo's view, because FDP did not return the over $1 million dollars in over-billings, but rather waived them, the category of "rebated" amounts does not apply. In support of its interpretation, Wells Fargo cites a CRS promotional document outside of the Agreement, in which CRS assures prospective clients that "there is no out-of-pocket expense to our clients. Our fees are tied directly to results paid from the savings realized by our clients." Torgerson Aff. Ex. 3 ("CRS Expert Dep."), at Dep. Ex. 2. Forcing Wells Fargo to pay a contingency fee for the amounts waived by FDP, Wells Fargo argues, would defy the terms of the Agreement and the intent of the parties.

Of the three types of "Savings," CRS argues Wells Fargo has interpreted "rebated" amounts too narrowly. The Agreement intends that the word "rebated" be broadly applicable, CRS argues, by stating that CRS may recover fees for any amount "rebated to the client in any other fashion acceptable to Client." Agmt. § 2.1(iii) (emphasis added). In this case, CRS argues that the amounts waived by FDP constitute an "instant rebate," by which Wells Fargo received value in the form of released debt.[2]

---

[2] In the alternative, CRS argues the waived over-billings are "limited recoveries" under Paragraphs 2 and 3, and that as a result, the parties must "endeavor to arrive at an equitable fee arrangement." This would constitute an unenforceable "agreement to agree." See Richie Co., LLP v. Lyndon Ins. Grp., Inc., 316 F.3d 758, 760-61 (holding Minnesota law finds "agreements to agree" unenforceable).

The "cardinal purpose" of contract interpretation is to "give effect to the intention of the parties as expressed in the language they used in drafting the whole contract." Art Goebel, Inc.v. N. Suburban Agencies, Inc., 567 N.W.2d 511, 515 (Minn. 1997).  When the parties dispute the meaning of a term, the ruling court "must first determine as a matter of law whether the contract is ambiguous." Barry v. Barry, 78 F.3d 375, 382 (8th Cir. 1996).  If the contract at issue is ambiguous, the court will then review extrinsic evidence, and "construction of the contract becomes a question of fact." Id.  However, a contract is not ambiguous simply because the parties disagree as to its meaning; rather, a contract is ambiguous "if its language is reasonably susceptible to more than one interpretation." Hartford Fire Ins. Co. v. Clark, 562 F.3d 943, 946 (8th Cir. 2009); Barry, 78 F.3d at 382.  Also, when a specific word is at issue, the fact that the word has more than one definition "does not mean it is ambiguous.  The sense of a word depends on how it is being used; only if more than one meaning applies within that context does ambiguity arise." Bd. of Regents of Univ. of Minn. v. Royal Ins. Co. of Am., 517 N.W.2d 888, 892 (Minn. 1994).

The dictionary offers support for both parties' positions.  Wells Fargo correctly argues that the amounts at issue here are neither "reimbursements" nor amounts applied to Wells Fargo's future rent payments or other unpaid obligations.  Thus, the first two categories of "Savings" do not directly apply here.  Addressing the third category of "rebated" amounts, the Oxford English Dictionary (OED) defines the noun "rebate" as "[a] deduction from a sum of money to be paid; a discount; esp. (in later use) one given retrospectively; a partial refund of money paid." Oxford English Dictionary (Online ed. 2014).  The Agreement specifically uses "rebate" as a verb.  When stated as a verb, a less common usage, the OED defines "rebate," in

relevant part, as "[t]o deduct or subtract (one quantity or number) from another; to allow (a sum) as a reduction. In later use chiefly: to pay back (a sum of money) as a rebate." Id. The dictionary offers additional definitions to the same effect, each of which includes the notion of a reduction in amount or payment.[3] Black's Law Dictionary defines "rebate" as "[a] return of part of a payment, serving as a discount or reduction." It also includes the word "rebate" as one definition of "concession": "[a] rebate or abatement." Black's Law Dictionary (9th ed. 2009).

Because multiple definitions for "rebate" may apply, the context in which the word is used must determine its meaning. Bd. of Regents, 517 N.W.2d at 892. Here, Wells Fargo's interpretation of the Agreement is unreasonably narrow. Wells Fargo argues that it is never required to pay CRS's contingency fee out of pocket because "Savings" refers only to actual payments returned or paid to Wells Fargo by its landlord. In essence, Wells Fargo argues that CRS's fee may only be "skimmed off the top" of any amount being paid back to Wells Fargo. This interpretation ignores the context of the word "rebated." The third category of "Savings" is broadly written; it includes any amount "rebated" in "any other fashion acceptable" to Wells Fargo. Agmt. § 2.1(iii). Construed to reflect this broad intent, the word "rebated" must include amounts discounted or reduced by the landlord in favor of Wells Fargo.

This view is supported by the second category of "Savings," which addresses credits to future rent payments or other obligations. Under this second category, if FDP had credited some amount against Wells Fargo's outstanding obligations, Wells Fargo would necessarily have to

---

[3] The additional, relevant definitions of the verb "rebate" are: (1.a.) "To reduce, lessen in force or intensity, diminish (a condition, quality, feeling, activity, etc.); to cause to abate"; (2.b.) "To give or allow a reduction to (a person, group, etc.); (in later use chiefly) to give (a person, business, etc.) a rebate or refund"; and (2.c.) "To reduce or diminish (a sum or amount); (in later use chiefly) to give a rebate on (a tax, bill, etc.)."

pay CRS's contingency fee "out of pocket."  Indeed, as part of its settlement with FDP, Wells Fargo received a rent credit of $146,000.  Although Wells Fargo did not actually receive any funds from FDP, Wells Fargo concedes that 34% of the $146,000 is what it properly owes CRS.  Admittedly, a credit against a properly-calculated obligation is conceptually different from the waiver of an erroneously-calculated obligation.  Nevertheless, they both involve the conferral of a monetary benefit to Wells Fargo without an actual transfer of funds.  In the case of a waiver, Wells Fargo is still gaining a monetary benefit because it is relieved of an obligation it otherwise owed; in essence, it has gained the same value as if the landlord had paid this debt on Wells Fargo's behalf.  Thus, the plain language of the Agreement itself makes Wells Fargo's interpretation unreasonable.

       To the extent it applies, Paragraph 4 further supports a broad reading of the term "rebated."  Paragraph 4 uses relatively wide-reaching language to further define "Savings," stating this term includes "all amounts, payments or other forms of remuneration" which "benefit Client by any form or method," directly or indirectly, so long as the benefit is derived in connection with a "Discrepancy" found by CRS.  Agmt. § 2.1.  This language, CRS contends, indicates that the term "Savings" should be broadly construed to include waived amounts or other reductions in amounts owed, because such waivers benefit Wells Fargo.  Wells Fargo concedes for summary judgment purposes that "Discrepancies," as defined by the Agreement, may include the over-billings at issue.  Even so, Wells Fargo argues the terms "payments" and "remuneration," by their definitions imply the direct payment of money to Wells Fargo, and not the waiver of obligations.

       Wells Fargo's interpretation of Paragraph 4 is unpersuasive because it again ignores that

"Savings" is expressly defined as including the application of credit to future rent or other expense payments; a form of benefit that does not include an actual payment. The phrase "other forms of remuneration" implies a broader meaning than simple payment, otherwise the phrase would be redundant because it immediately follows the word "payment." "Remuneration" may address the general conferral of value. See "Remuneration," Black's Law Dictionary (defining "remuneration" as "Payment; compensation"); see also "Remuneration," OED (defining "remuneration" as "reward, recompense; (now usually) money paid for work or a service; payment, pay"). Under the broader interpretation, "Savings" includes waived obligations, because such waivers confer value to Wells Fargo; Wells Fargo no longer has to pay a previously-due amount. And, even if Wells Fargo's interpretation of Paragraph 4 was correct, it would not preclude the meaning of "rebated" discussed above because the additional language in Paragraph 4 is inclusive, not exclusive. Given the broad language of Section 2.1, the parties unambiguously intended the term "Savings" to encompass erroneous billings discovered by CRS.

## C. Expense Stop

Under the above interpretation of the Agreement, it is still unclear whether the $290,000 expense stop qualifies as "Savings." An expense stop essentially sets a "floor" for Wells Fargo's expenses. Wells Fargo is not obligated to pay expenses below the stop amount; it must only pay expenses if and when those expenses reach higher than the stop. Thus, for example, Wells Fargo would only be responsible for $100,000 if its total expenses for a year were $400,000, and FDP offered a $300,000 expense stop.

As part of its settlement with FDP, Wells Fargo negotiated a $290,000 expense stop for

11

lease year 2011. Wells Fargo argues that this amount is less than the $308,000 expense stop Wells Fargo enjoyed in 2010, meaning the negotiated amount actually saves Wells Fargo less money. CRS responds that, in fact, FDP did not apply any expense stop to Wells Fargo's expenses in 2011, and that the expense stop was reapplied only due to CRS's audit. Thus, CRS argues the $290,000 deduction of expenses qualifies as "Savings" because Wells Fargo no longer has to pay that amount.

In theory, CRS is correct that the application of an expense stop—where no expense stop was previously applied—would qualify as an amount "applied by Client to future rents or any other obligation," the second category of "Savings." However, it appears the parties disagree as to whether FDP applied an expense stop to Wells Fargo's expenses for lease year 2011, and the parties also disagree as to whether FDP ultimately applied the $290,000 stop due to CRS's audit. See, e.g., CRS Dep. Ex. 12 (indicating FDP did not apply an expense stop for years 2009 and 2010). The parties have not directly addressed these factual issues, and the Court does not have sufficient information to make these determinations as a matter of law.

**D. Qualification of Over-Billings and Previously Unrecognized Credit as "Discrepancies"**

Although this Order interprets the Agreement as applying to erroneous over-billings, the dispute between the parties is not resolved. The Agreement only confers a fee to CRS for obtaining "Savings" for Wells Fargo from "Discrepancies" that CRS itself found. In its briefs and at oral argument, Wells Fargo described the over-billings as "without merit or value," "bogus," and as "charges Wells Fargo had never paid." Wells Fargo argues, essentially, that it knew these nearly $1.1 million in over-billings initially sought by FDP never had any basis, and that CRS did not identify them as "Discrepancies" under the Agreement so much as state the

obvious.

The status of the over-billings discussed by the parties lacks clarity for judgment on the current record.  In April 2009, CRS wrote to FDP that it found over $1 million in erroneous over-billings.  If Wells Fargo can substantiate its claim that it had already decided not to pay these erroneous over-billings at the time of the Iowa audit, Wells Fargo cannot be held liable for these amounts because CRS did not actually discover them as required by the Agreement.  The same analysis would apply to the $446,256.00 in previously-uncredited payments for 2006.  If Wells Fargo had already recognized that it made this payment to FDP previously, CRS cannot properly earn a contingency fee for it.

## IV.  CONCLUSION

Based upon the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that Wells Fargo Bank, N.A.'s Motion for Summary Judgment [Docket No. 18] is **DENIED**.

BY THE COURT:

    s/Ann D. Montgomery  
ANN D. MONTGOMERY  
U.S. DISTRICT JUDGE

Dated: March 25, 2014.